## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

THE NAVAJO NATION,

      Plaintiff,

v.                                    Case No.

THE UNITED STATES OF AMERICA,
DEBRA ANN HAALAND, in her official capacity as Secretary of the Interior
U.S. DEPARTMENT OF THE INTERIOR;
U.S. BUREAU OF LAND MANAGEMENT;

      Defendants.

## <u>COMPLAINT</u>

    Plaintiff The Navajo Nation ("Plaintiff") hereby files this Complaint against Defendant U.S. Department of the Interior and its relevant officials and subagencies under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## INTRODUCTION

    1.    The Navajo Nation resides on a reservation held in trust for the use and benefit of the Navajo Nation people with bare legal title held by the trustee United States and full equitable and beneficial title held by the Navajo Nation.  Defendant holds title to approximately 19,000,000 acres of land and its subsurface for the beneficial use of the Nation, and thousands of additional acres for the beneficial use of Allottees.  As bare legal titleholder, the United States is charged with administering the land and mineral estate in the best interest of the Nation and Allottees.  The Navajo Nation has over 421,000 enrolled members.

    2.    Defendant is the United States, acting by and through its various authorized agencies including, but not limited to, the United States Department of the Interior, Secretary

Debra Haaland, the Bureau of Land Management, and the Bureau of Indian Affairs.

3.    Defendant owes numerous enforceable fiduciary duties to the Nation with respect to the Nation's trust assets and resources, including the duty to administer the Nation's and Allottee's trust resources appropriately, and to consult in good faith with the Nation. The United States holds a trust responsibility to "[a]ppropriately manag[e] the natural resources located within the boundaries of Indian reservations and trust lands." 25 U.S.C. § 162a(d)(8).  In its capacity as trustee it holds the Navajo Allottees' lands and mineral resources in trust "for the sole use and benefit of the Indian to whom such allotment [has] been made." 25 U.S.C. § 348.  The United States is also charged with ultimate approval authority over tribal Minerals Agreements. 25 U.S.C. § 2103(b) ("In approving or disapproving a Minerals Agreement, the Secretary shall determine if it is in the best interest of the Indian tribe or of any individual Indian who may be party to such agreement and shall consider, among other things, the potential economic return to the tribe; the potential environmental, social, and cultural effects on the tribe; and provisions for resolving disputes that may arise between the parties to the agreement[.]") Defendant is trustee and a fiduciary to the Navajo Nation and Allottees, and is charged with carrying out trust duties and responsibilities with regard to the management and administration of funds and mineral assets held in trust for the use and benefit of the Nation and its citizens.  The Secretary of the Interior, as the principal agent of the trustee United States, has continuously reaffirmed that the trust responsibilities of the United States to the Nation are well-established, originated with the formation of the United States Government, and are an ongoing obligation.  Secretarial Order No. 3335 (Aug. 20, 2014); see *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) (recognizing the federal Indian trust responsibility is a legal obligation under which the federal

government "has charged itself with moral obligations of the highest responsibility and trust"); see *U.S. v. Mitchell*, 463 U.S. 206, 225 (1983) ("[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians."). The Secretarial Order states that "[t]he trust responsibility consists of the highest moral obligations that the United States must meet to ensure the protection of tribal and individual Indian lands, assets, resources, and treaty and similarly recognized rights." Secretarial Order No. 3335 (Aug. 20, 2014) at 3(a).

The responsibility owed to the Nation by the United States is constant and operates in tandem with other statutory mandates placed upon it, including those enumerated in the National Environmental Policy Act ("NEPA"), The Federal Land Policy and Management Act ("FLPMA") of 1976, and other statutes.

4.  The Secretary failed to adhere to her statutory obligations, as well as her fiduciary duty to the Navajo Nation and its citizens, by implementing the Chaco Canyon Withdrawal ("the Withdrawal") of mineral resources.

5.  The Secretary, without adequate consultation with and notice to the Navajo Nation, and relying on inadequate data and faulty assumptions, implemented the Withdrawal that significantly impacts the Navajo Nation and its citizens, an Environmental Justice community under the law.

6.  As a sovereign government, the Nation has an inherent sovereign interest in matters that affect the Nation's lands and citizens within its exterior boundaries.

7.  The Department has a duty to engage with the Nation in two-way, government-to-government discussions when making decisions that impact the Nation's sovereign interests.

The Department failed to respect the Nation's sovereignty and interests in lands within its own reservation boundaries, instead substituting its own judgment for that of the Nation's in determining what is best for the Navajo Nation and its people.

8.     The Withdrawal should be vacated in light of significant impacts to the Navajo Nation and its citizens.

## PARTIES

9.     Plaintiff THE NAVAJO NATION is a federally recognized Indian tribe whose reservation and off-reservation trust lands are located in the states of New Mexico, Arizona, and Utah. Plaintiff is owner or partial owner of certain allotted or tribal trust lands affected by the Withdrawal. In addition to its legally recognized beneficial property interests in lands affected by the Withdrawal, Plaintiff also has significant historical, cultural, and temporal connections to the greater Chacoan landscape, including the Withdrawal area. Finally, Plaintiff holds sovereign interests in protecting the economic interests of the Navajo Nation, Navajo citizens and Allotees whose oil and gas royalty income are affected by this Withdrawal.

10.     Defendant DEBRA ANN HAALAND is sued in her official capacity as Secretary of the U.S. Department of the Interior. FLPMA, 43 U.S.C. §§ 1701-84, delegates certain authority to the Secretary of the Interior with respect to public land interests managed by the Bureau of Land Management ("BLM"). Relevant here, FLPMA Section 204(a) authorizes the Secretary to "make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section." 43 U.S.C. § 1714(a). Secretary Haaland issued the Public Land Order effectuating the Chaco Canyon Withdrawal under the authority of Section 204(c) of FLPMA, 43 U.S.C. § 1714(c). Public Land Order No. 7923 for Public Lands

Withdrawal Surrounding Chaco Culture National Historical Park Boundary; San Juan, Sandoval, and McKinley Counties, New Mexico, 88 Fed. Reg. 37266 (Jun. 7, 2023).

11.    Defendant U.S. DEPARTMENT OF THE INTERIOR is the agency delegated with the authority to administer FLPMA and, in doing so, is subject to NEPA

12.    Defendant BUREAU OF LAND MANAGEMENT is a bureau within the Department of the Interior that manages the lands included within the Withdrawn area and was the lead agency in preparing the Final Environmental Assessment challenged here.

**JURISDICTION & VENUE**

13.    This action is brought pursuant to the APA, 5 U.S.C. § 551 et seq;, National Environmental Policy Act ("NEPA") of 1969, 42 U.S.C. §§ 4321 *et seq*., and FLPMA, 43 U.S.C. § 1714.

14.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant).

15.    This Court can grant declaratory relief, set aside improper action, and grant injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 705, 706, for violations of FLPMA, NEPA, and the APA.

16.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Chaco Canyon National Historical Park is located in New Mexico. Venue is also proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to this case occurred in New Mexico and because Plaintiff reside in New Mexico or on Navajo Nation land located within the State of New Mexico.

17.    This action represents an actual, present, justiciable controversy between Plaintiff

and Defendants. As further described below, the Withdrawal will significantly reduce the ability of the Nation and its members to develop the mineral rights to which they hold beneficial title. This will result in sizable financial losses, especially relative to modest incomes that are prevalent in this isolated region, and will significantly reduce economic activity and employment in the region, further detrimentally affecting the Nation and its citizens.  These injuries are concrete, particularized, and directly traceable to the Public Land Order effectuating the Withdrawal.

18.     The requested relief would redress the Nation's actual, concrete injuries caused by BLM's failure to comply with duties mandated by the APA, NEPA, FLPMA, the regulations promulgated under these statutes, and the United States' fiduciary duty to tribal governments.

19.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

20.     Plaintiff has exhausted any and all available and required administrative remedies. Plaintiff participated in the notice and comment process and submitted comments opposing the Withdrawal.

## STATUTORY BACKGROUND

### *The Administrative Procedure Act (APA)*

21.     The APA provides a right to judicial review to any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.

22.     Under the APA, a reviewing court shall, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions may also be set aside in other

circumstances, such as where the action is "without observance of procedure required by law."  5 U.S.C. § 706(2)(B)-(F).

***The National Environmental Policy Act (NEPA)***

23.    NEPA is "a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1 (2022).  This federal environmental law requires all federal agencies to consider the impact of actions on the human environment as part of the decision-making process and to inform the public about these impacts before taking "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021 (10th Cir. 2002).

24.    To determine whether a proposed action significantly affects the quality of the human environment, and whether an Environmental Impact Statement ("EIS") is required, an agency may first prepare an Environmental Assessment ("EA").  Based on the EA, the federal agency either concludes its analysis with a Finding of No Significant Impact ("FONSI") or with a determination that a full EIS is necessary.  40 C.F.R. § 1501.3 (2022); 40 C.F.R. § 1501.6 (2022).

25.    NEPA requires the government to seriously consider and address plausible alternatives to the proposed action, and if the NEPA documents do not consider the alternatives in sufficient detail, it may be necessary to supplement NEPA documents with additional information.  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).

26.    "[I]f an agency predetermines the NEPA analysis by committing itself to an outcome, the agency likely has failed to take a hard look at the environmental consequences of its actions due to its bias in favor of that outcome and, therefore, has acted arbitrarily and capriciously." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1264 (10th Cir. 2011).

27.    In addition to preparing the NEPA documents, federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a) (2022). To the fullest extent possible, agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d) (2022). At a minimum, agencies must "[p]rovide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected[.]" 40 C.F.R. § 1506.6(b) (2022).

28.    The regulations implementing NEPA require that the agency verify the accuracy of information in environmental documents, 40 C.F.R. § 1506.5(a) (2022), respond to substantive issues raised in comments, 40 C.F.R. § 1503.4(a) (2022), "discuss any inconsistency of a proposed action with any approved State or local plan and laws" and, "[w]here an inconsistency exists … describe the extent to which the agency would reconcile its proposed action with the plan or law." 40 C.F.R. § 1506.2(d) (2022); *Utahns for Better Transp.*, 305 F.3d at 1165.

29.    The Department is required by Executive Order and Council on Environmental Quality ("CEQ") regulations to consider the impacts—including economic and social impacts—

of its actions on environmental justice ("EJ") communities[1]. In addition, CEQ regulations provide:

> Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include the following: … (4) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.

40 C.F.R. § 1508.1(g) (2022).

30.    CEQ regulations direct agencies to use certain protocols when information is unknowable, including using theoretical methodologies. *See Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021); 40 C.F.R. § 1502.21(c) (2022).

31.    The Department claims that it acted pursuant to the CEQ NEPA regulations when analyzing the impacts of the Withdrawal.

### *U.S. Department of the Interior Tribal Consultation Policy*

32.    The Department of the Interior has issued a consultation policy directing the Agency on how it will consult with tribes, and is explicitly applicable to the NEPA process. *See* U.S. DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE INTERIOR POLICY ON CONSULTATION WITH INDIAN TRIBES, 512 DM 4, § 4.1 (Nov. 30, 2022).

33.    The Department's Consultation Policy states:

---

[1] In *Marin Audubon Society v. Federal Aviation Administration*, No. 23-1067 (D.C. Cir. Nov. 12, 2024), the U.S. Court of Appeals for the D.C. Circuit held that the White House Council on Environmental Quality (CEQ) lacked the authority to issue binding regulations implementing NEPA. The parties to *Marin Audubon* are seeking en banc review and these regulations have not been vacated. This Court may still rely on them in considering whether the agency complied with NEPA under the facts of in this Complaint.

It is the policy of the Department to recognize and fulfill its legal obligations to identify, protect, and conserve Tribal trust resources; carry out its trust relationship with Federally recognized Tribes and Tribal members; and invite Tribes to consult on a government-to-government basis whenever there is a Departmental Action with Tribal Implications. All Bureaus and Offices shall make good-faith efforts to invite Tribes to consult early in the planning process and throughout the decision-making process and engage in robust, interactive, pre-decisional, informative, and transparent consultation when planning actions with Tribal implications. It is the policy of the Department to seek consensus with impacted Tribes in accordance with the Consensus-Seeking Model.

*Id.* § 4.4.

34.     The Department is required to follow its own stated policies, even if those policies exceed statutory requirements. *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required."); s*ee, e.g. Yankton Sioux Tribe v. Kempthorne,* 442 F. Supp. 2d 774, 784 (D.S.D. 2006) ("Where the BIA has established a policy requiring prior consultation with a tribe, and therefore created a justified expectation that the tribe will receive a meaningful opportunity to express its views before policy is made, that opportunity must be given.").

## FACTUAL BACKGROUND

### *Chaco Canyon and Surrounding Navajo Communities*

35.     Chaco Canyon National Historical Park ("CCNHP") was designated as a National Monument in 1907 by President Theodore Roosevelt and ultimately became a U.S. National Historical Park in 1980. Proclamation No. 740 (1907); 16 U.S.C. § 410ii-1

36.     The CCNHP is located in New Mexico between Albuquerque and Farmington in a remote canyon cut by the Chaco Wash, spanning 30,000 acres.

37.     Underlying the CCNHP and the San Juan Basin, the Mancos Shale formation is a

highly productive source of natural gas, with nearly 40,000 oil and gas wells drilled in the past sixty years, 23,300 of which remain active.

38.    The region most directly affected by the Public Land Order effectuating the Withdrawal is the Eastern Navajo Agency.

39.    The Eastern Navajo Agency encompasses "checkerboarded" communities that reside in the Withdrawal area in Northwestern New Mexico. This area is often described as "checkerboarded" because the combination of federal land, allotted land, state land, and private land creates a checkboard pattern on the map.

40.    The Nation and its members have very deep ties to this region, residing within the four mountains that the Diné (which translates to The People" and is the what the Navajo call themselves) consider sacred and where their ancestors have lived since before European contact.

41.    The Eastern Navajo Agency was not part of the original Reservation, which was created by the Treaty of 1868. *See* Peter Iverson, DINÉ: A HISTORY OF THE NAVAJOS 100 (Univ. New Mexico Press 2002).  Instead, this section of the Eastern Navajo Agency was added to the Reservation by Presidential executive order on November 9, 1907.  *Id.* at 72.  However, after intense lobbying by non-Indian ranching and railroad interests, these same lands were removed from the Reservation and restored to the federal public domain by executive orders issued on December 30, 1908 and January 16, 1911. *Id.* Navajo families in the area were granted allotments by the federal government in the late 1920s and early 1930s. These allotments have passed down through generations by devise, or more typically operation of law through intestacy, and have typically become highly fractionated by multiple heirs. *See id.* at 94-95. This fractionation further complicates surface land development, particularly when nearly all the

allotments at issue are too arid to profitably farm or ranch.  Because of the fractionated land status and lack of water, the presence of subsurface minerals is the only financial resource for Navajo families.

42.    This area remains one of the least economically developed places in the United States, and Navajo Allottees residing in this rural region rely heavily on royalty payments from oil and gas leasing for their livelihoods. The Nation has a median household income of just $29,884. *See* Federal Reserve Bank of Minneapolis, Navajo Nation Reservation Profile, https://www.minneapolisfed.org/indiancountry/resources/native-community-data-profiles    (last visited Jan. 15, 2025).  Only nine percent of adult residents have a college degree. *Id.*

43.    Each allottee whose mineral interests have been developed receive royalties totaling approximately $20,000 per year. *See Legislative Hearing on H.R. 4374: Hearing Before the Subcomm. on Energy and Min. Res. of the H. Comm. on Nat. Res.,* 118th Cong. (2023) (statement of Dr. Buu V. Nygren, President, Navajo Nation).

44.    Economic conditions are bleak in the Eastern Navajo Agency, where the Nation and Allottees—all enrolled citizens of the Nation—eke out a living on allotted lands allocated to their forebearers by the federal government, in the territory where their ancestors have resided since time immemorial.

45.    In the Nageezi Chapter, a unit of local government adjacent to the Withdrawal area, the Navajo Times reported in 2013 that 30 percent of households lack electricity.  Cindy Yurth, *The Orphan on the Checkerboard*, THE NAVAJO TIMES (Apr. 9, 2013), http://navajotimes.com/news/chapters/050913hue.php. Very little development has occurred in this area since that report was published.

46. The neighboring Huerfano Chapter is only accessible by unpaved roads. *Id.*

47. Defendants, through this Withdrawal, will eviscerate the chief remaining source of economic benefit from the Nation and its citizens' limited landholdings: mineral royalty revenue.

48. Each individual "square" on this "checkerboard" is too small to support mineral development without the participation of the surrounding parcels. This is why the Withdrawal of federal minerals from development effectively also withdraws the Navajo Nation and Allottee minerals, without consent, compensation, or sufficient justification.

### Oil and Gas Development Within and Around the Nation

49. The area where the oil and gas development would take place is isolated from Chaco Canyon by a large plateau, several miles of road, and is not visible from the Park. Because of the geology of the region, there is little oil and gas located within five miles of the Park's boundary.

50. According to the U.S. Geological Survey's 2002 Assessment of Undiscovered Oil and Gas Resources in the San Juan Basin Province, Exclusive of Paleozoic Rocks, New Mexico, and Colorado, the San Juan Basin (where the Withdrawal area is located) was estimated to hold roughly 19 million barrels of undiscovered oil, 50 trillion cubic feet of undiscovered gas, and 148 million barrels of undiscovered natural gas liquids. U.S. GEOLOGICAL SURVEY SAN JUAN BASIN ASSESSMENT TEAM, 69-F, EXECUTIVE SUMMARY – 2002 ASSESSMENT OF UNDISCOVERED OIL AND GAS RESOURCES IN THE SAN JUAN BASIN PROVINCE, EXCLUSIVE OF PALEOZOIC ROCKS, NEW MEXICO AND COLORADO (2013).

51.     According to the 2022 Mineral Potential Report, there are over 1,000 wells in the ten-mile buffer, of which 333 wells are active that include 104 allotted leases, 80 valid federal leases, and 25 state leases. BUREAU OF LAND MANAGEMENT, MINERAL POTENTIAL REPORT, § 4.2.3 (Nov. 2022).

52.     However, many Allottees have valuable mineral rights that they have not leased, or that they have leased but have been unable to develop because the oil and gas companies have not successfully leased the surrounding federal minerals or obtained applicable permits to drill. The Withdrawal will cut off these families from developing the minerals to which they have beneficial title.

53.     BLM estimates that "[t]he proposed removal of approximately 338,690 acres of federal mineral estate from mineral entry and leasing would reduce foreseeable development by approximately 20 horizontal and 27 vertical or directional wells and would result in an estimated loss of up to 49 jobs and $12.2 million in total economic contributions per well, per year, over the 20-year withdrawal time frame." BUREAU OF LAND MANAGEMENT, PROPOSED CHACO AREA WITHDRAWAL ENVIRONMENTAL ASSESSMENT, DOI-BLM-NM-F010-2022-0011, § 4.3.2 (Nov. 2022) ("Draft EA").

54.     Most Allottees who receive oil and gas royalties double their income, from around $20,000 to around $40,000, which is still below the median income in the United States. *See* BUREAU OF LAND MANAGEMENT, PROPOSED CHACO AREA WITHDRAWAL ENVIRONMENTAL ASSESSMENT, DOI-BLM-NM-F010-2022-0011, Table 4-10 (May 2023) ("Final EA").

55.     In exchange for this loss of jobs and income to the community, "the proposed withdrawal *could* have a positive impact on the Chaco region's scenic and cultural values, with

accompanying benefits to the quality of experiences for recreational users."  Final EA at § 4.3.2.1 (emphasis added).

56.    BLM grossly underestimates the reduction in foreseeable development and the financial impact to the Nation and Allottees, especially in light of the rapid improvements in extraction technology. *See id.* at § 4.2.2.1 ("However, it is difficult to quantify the extent of the reduction in federal oil and gas production under a withdrawal. Quantification would depend on several factors, including the level of demand, oil price, technological advancements in extraction technology, and the amount of additional development occurring on existing leases.") Despite not having complete information, and despite the comments received, BLM believes that it overestimated the potential losses due to the Withdrawal. *See* BLM, Proposed Chaco Area Withdrawal Environmental Assessment, Public Comment Response Report, Appx. A (May 2023).

57.    BLM did not adequately consider any adjustment to the Withdrawal area boundary that might reduce these impacts and maintain the beneficial use of some of these allotments; instead it has pursued an exact ten-mile line that bears no relationship to the broken landscape nor its actual physical or geological features.

58.    Prior to the Withdrawal, the BLM Farmington Field Office and DOI's Navajo Regional Office spent many years working with the tribes with an interest in Chaco Canyon, developing a new Resources Management Plan Amendment ("RMPA") to update the existing 2003 RMP, EIS, and Programmatic Agreement, addressing development of natural resources and protection of our lands and cultural resources.

59.    BLM began this process to update the 2003 RMP in 2013. Improvements and innovations in horizontal drilling technology and multi-stage hydraulic fracturing enhanced the economics of developing this stratigraphic horizon. Additionally, favorable oil prices drew

considerable interest. All of this contributed to the potential for additional impacts that previously were not anticipated or analyzed in the 2003 RMP/EIS.

60.    Rather than continue with the process for amending the 2003 RMP/EIS, which had already cost taxpayers millions of dollars and took several years of careful collaboration with tribal governments, local stakeholders, and the BLM, the BLM conducted this separate, hurried action to withdraw the minerals from extraction. The Withdrawal does not address the 2003 RMP/EIS, Draft RMPA/EIS, or Programmatic Agreement.

***Efforts to Withdraw Land Surrounding CCNHP***

61.    Both the Huerfano Chapter and Nageezi Chapter of the Navajo Nation adopted resolutions in opposition to the proposed Withdrawal on July 8, 2018 (Resolution # Hue-090-18) and July 1, 2018 (Resolution # NC-18-077).

62.    Efforts to withdraw public lands surrounding CCNHP intensified in 2019 when the Chaco Cultural Heritage Area Protection Act of 2019 was introduced in the U.S. House of Representatives and the U.S. Senate. The Navajo Nation opposed the proposed Withdrawal until the proposed ten-mile buffer area was reduced to five miles.

63.    On January 13, 2020, the Nabiki'yati' Committee of the Navajo Nation Council officially adopted Resolution No. NABIJA-05-20, expressing their support for a five-mile buffer around the CCNHP, but not the proposed ten-mile buffer.

64.    On November 15, 2021, President Biden announced a new effort by the U.S. Department of the Interior to protect Chaco Canyon, and shortly thereafter, Navajo Nation then-President Jonathan Nez sent a letter to President Biden requesting consultation and stating opposition to a ten-mile buffer, and support for a five-mile buffer alternative as a compromise.

*Secretary Haaland Announces Steps to Establish Protections for Culturally Significant Chaco Canyon Landscape*, U.S. DEPARTMENT OF THE INTERIOR (Nov. 15, 2021), https://www.doi.gov/pressreleases/secretary-haaland-announces-steps-establish-protections-culturally-significant-chaco; *Legislative Hearing on H.R. 4374: Hearing Before the Subcomm. on Energy and Min. Res. of the H. Comm. on Nat. Res.,* 118th Cong. (2023) (statement of Dr. Buu V. Nygren, President, Navajo Nation).

65.    Without meaningful consultation with Navajo Nation and Allottees, on January 6, 2022, BLM formally petitioned the Secretary to withdraw over 350,000 acres of public lands surrounding the CCNHP and provided a 120-day public comment process. Notice of Proposed Withdrawal and Public Meetings; San Jan County, NM, 87 Fed. Reg. 4, 785 (Jan. 6, 2022). It also segregated the lands for up to two years while the BLM conducted its NEPA analysis and tribal consultation.

66.    On February 23 and 24, 2022, the BLM hosted three public meetings: two in-person in Farmington, NM and one virtual. On February 23, 2022, Assistant Secretary for Indian Affairs, Bryan Newland held a closed meeting with the Allottees, Navajo Nation chapter president and leaders of the Nation, and on February 24, 2022, Mr. Newland met with Navajo Nation President Jonathan Nez and with members of the Navajo Nation Council in Window Rock, AZ.  At these sessions, President Nez and Nation representatives reiterated the Nation's opposition to a ten-mile buffer and support for a five-mile alternative as a compromise. *Questions for the Record, Hearing Before the Subcomm. on Energy and Min. Res. of the H. Comm. on Nat. Res.,* 118th Cong. (2023) (responses of Nada Wolff Culver, Principal Deputy Director, Bureau of Land Management).

67.     In March, 2022, then-President Nez met with Secretary Haaland requesting a reduction of the buffer zone from ten miles to five. After that meeting, the Nation submitted comments opposing the proposal on May 6, 2022. The Navajo Nation, Comments Regarding: Chaco Culture National Historic Park Area Withdrawal (May 6, 2022).

68.     On April 27 through 29, 2022, the BLM and Assistant Secretary of Indian Affairs hosted public meetings in Farmington, Nageezi, and Albuquerque, NM.  At each of the meetings, political appointees from the DOI attended, as well as the Allottees and other tribes who provided comment. *Questions for the Record, Hearing Before the Subcomm. on Energy and Min. Res. of the H. Comm. on Nat. Res.,* 118th Cong. (2023) (responses of Nada Wolff Culver, Principal Deputy Director, Bureau of Land Management).

69.     Despite many Allottees speaking Navajo as a first (and sometimes only) language, no Navajo interpreters were present at any public meeting or session held as "consultation" by the Department, which the Department has provided during other consultations.

***The Withdrawal's NEPA Process***

70.     On November 1, 2022, the Draft EA proposed to withdraw approximately 338,690 acres of public lands surrounding Chaco Canyon from location and entry under the United States mining laws and from leasing under the mineral leasing laws. Draft EA § 1.1. This Withdrawal is in a larger area of over 958,800 acres of mixed ownership lands including Allottee and Navajo Nation lands. Final EA, Table 1-2. Notably, the Draft EA did not include the five-mile buffer alternative proposed myriad times since President Biden's announcement in 2021 (and before, in Congressional testimony) by the Nation so that the Nation and other members of the public could submit comments on it.

71.    On June 2, 2023, the BLM issued the Final EA, FONSI, and Public Land Order No. 7923 formally implementing the ten-mile buffer around CCNHP and withdrawing approximately 336,404.42 acres[2] from BLM-managed lands.

72.    The Draft EA included a "Purpose and Need" Statement, which provides:

The purpose of the proposed withdrawal is to protect the public lands proposed for withdrawal and the greater connected landscape containing rich Puebloan, Tribal Nations, and cultural legacies in northwestern New Mexico from the industrial impacts associated with oil and gas development activities, as well as the adverse effects of exploration and mining, subject to valid existing rights. The need for action arises from the increasing threats that exploration and development pose to these sensitive cultural resources. Specifically, the [Park] and surrounding areas are deeply sacred and irreplaceable landscapes for the Pueblos and Tribal Nations. Their ancestral history is linked to the [Park] and its surrounding landscape, and their past and present lifeways honor these ancestral traditions and customs.

Draft EA § 1.2.

73.    The Final EA provides an identical "Purpose and Need" statement as in the Draft EA. Final EA § 1.2.

74.    The National Historic Preservation Act, 54 U.S.C. § 300101, *et seq.*, requires, for any action requiring federal approvals—which includes all development on the Eastern Navajo Agency—an extensive effort to identify any potentially affected historic properties and mitigate any effects, generally through avoidance.  These efforts include extensive field surveys as well as consultation with a wide range of parties.  *See* 36 C.F.R. § 800.4 (2023).

75.    In an effort to preserve the cultural heritage of the Navajo Nation, the Navajo Nation Cultural Resources Protection Act, 19 N.N.C. § 1001, *et seq.,* requires a permit be obtained, and an archaeological clearance survey be conducted, prior to any ground disturbing

---

[2] As compared to the Draft and Final EA which indicate that 338,690 acres of public lands would be withdrawn.

activities.  19 N.N.C. § 1021.  The Navajo Nation Historic Preservation Department coordinates this effort through consultation, and enforcement of tribal and federal historic preservation laws, in cooperation with states, the federal government, and other tribes.  *Id.* at §§ 1102, 1004.

76.    Notably, none of the NEPA documentation describes any modern incidents in which an archaeological site was damaged by mineral development. Nor does the Final EA address the extensive federal statutory and regulatory regimes already in place to protect the CCNHP from oil and gas development in the area and why those are insufficient to achieve the cultural and environmental protection goals that the Withdrawal claims. These include protections under the Endangered Species Act, National Historic Preservation Act, Native American Graves Protection and Repatriation Act, the 2003 Farmington Resource Management Plan and the federal land and resource planning and amendment process, and NEPA itself.

77.    BLM's own manual provides that, "[i]f a withdrawal is intended to protect a particular resource, [BLM must include] a narrative describing how the resource is in terms of its rarity, significance, fragility, or irreplaceability, as well as an explanation of why existing law or regulation cannot protect or preserve the resource. *If authorized, acreage will be kept to the minimum needed to protect or preserve the withdrawn resource(s)*." BUREAU OF LAND MANAGEMENT, TRIBAL RELATIONS, MS-1780, § A(10) (2016) (emphasis added).

78.    Neither the Draft EA nor the Final EA address why existing laws cannot protect or preserve Chacoan sites, including the Nation's own laws and regulations established to protect sacred sites and cultural patrimony.

79.    The reasoning underlying the Withdrawal is internally inconsistent. Defendants assert that the Withdrawal is necessary to prevent future oil and gas development in the areas

surrounding CCNHP. *See* Final EA § 1.2 ("The purpose of the proposed withdrawal is to protect the public lands proposed for withdrawal and the greater connected landscape containing rich Puebloan, Tribal Nations, and cultural legacies in northwestern New Mexico from the industrial impacts associated with oil and gas development activities, as well as the adverse effects of exploration and mining, subject to valid existing rights. The need for action arises from the increasing threats that exploration and development pose to these sensitive cultural resources.").

80.    However, throughout the Final EA, Defendants emphasize the supposed minimal economic impact its proposal will have on the Nation and its members, asserting that minerals owned by private, state, or tribal entities could continue to be developed even after the Withdrawal. *See id.* § 4.4.2.1 ("The withdrawal would not affect existing valid leases or rights and would not apply to minerals owned by private, state, or Tribal entities."); *see id.* ("Because the proposed withdrawal would remove federal subsurface resources from location, entry, or leasing, exclusive of trust and exclusive of a valid existing right under which mineral development can continue in accordance with the terms and conditions of said rights, the impacts of the proposed withdrawal are therefore necessarily indirect with respect to Indian Allottees.").

81.    If Defendants are correct that the Withdrawal will limit oil and gas development and thus offer greater protections to CCNHP, they have significantly discounted and improperly analyzed the economic devastation caused to the Nation and its citizens, rendering the decision by the Secretary to make the Withdrawal arbitrary and capricious.

82.    If, however, Defendants are correct that the economic impact of the Withdrawal on the Nation and Allottees will be "necessarily indirect," presumably because state, private, and tribal minerals will continue to be developed, then the Withdrawal fails its own stated purpose

and need, and is also arbitrary and capricious. *See id.*

83.     The Final EA discusses the region as a four-county area with particular census tracts, and only evaluates whether the impacts of the Withdrawal will affect the residents of each county area disproportionately. Final EA § 4.4.1.1. It completely fails to acknowledge that many of the communities within the specified areas are low-income communities whose members hold mineral interests in allotments. The Final EA states that, "[o]verall, the proposed withdrawal's impacts on EJ communities . . . would not be disproportionate compared with the effects of the proposed withdrawal on non-Tribal lands." *See* Final EA § 4.4.2.1.

84.     The Final EA does not account for the percentage of income in Navajo EJ communities derived directly from oil and gas leasing and production in the area. While the general population of the four counties analyzed will experience aggregate, indirect impacts from the Withdrawal, Navajo communities with mineral interests in the region will naturally be disproportionately impacted by the Withdrawal because their livelihoods depend upon royalties from mineral development.

85.     BLM admitted that it did not and could not analyze the actual impact to the Nation and Allottees, but still concluded that the impact would be insignificant. While recognizing that "[m]any Navajo Allottees depend economically on the development of minerals within the area," the Department admitted that, "[b]ecause of the private nature of allotted resources held in trust . . . and the reality of location-dependent variable actual or estimated potential production, it is difficult for the BLM to quantify the indirect impacts of the proposed withdrawal on individual allottees. The BLM does not have access to the trust information maintained by the BIA to make such detailed analysis." Final EA § 4.4.2.1. BLM goes on to state

that "Tribal Trust and Fee oil and gas leases were not analyzed because the National Indian Oil & Gas, Energy and Minerals System (NIOGEMS) spatial data in which Tribal leases are maintained was evaluated to be dated and missing significant information. By omitting the inadequate NIOGEMS data, the analysis affords adverse-case impacts to some allotments which may be, in reality, mitigated by an existing, unanalyzed Tribal lease." *Id.*

86.     By failing to obtain information from BIA, an agency within the Department, to conduct an analysis of potential economic impacts, the Department provided scant justification and faulty analysis for its conclusion that tribal residents will not suffer disproportionate impacts when compared to non-tribal communities. Further, the Department failed to acknowledge that NIOGEMS data, if provided, could show increased impacts as opposed to mitigating data.

87.     From the very beginning of this process, Defendants have single-mindedly pursued an exact ten-mile buffer without sufficient analysis or explanation of why that particular number was chosen or how it relates the actual topography and geology of the landscape or the location of the Chacoan sites.  For example, there is no analysis that shows a scatterplot of the location of the sites with a dense concentration at around the ten-mile point in a concentric circle around the Park that would support the decision to draw a circle with a ten-mile diameter.

88.     The Navajo Nation consistently supported a five-mile buffer, as a compromise position that would preserve much of the economic activity in the region and preserve the rights held by the Nation and Allottees.

89.     Despite the Nation's letters, comments, and meetings with the Department prior to issuance of the Draft EA, it did not analyze the five-mile buffer as an alternative, and only analyzed the minimum of two alternatives: "No Action" and "Proposed Action." Draft EA §§

2.1, 2.2. By failing to include the five-mile alternative in the Draft EA, the Department precluded

public comment on the five-mile alternative.

90.    Comments to the Draft EA were submitted by the Nation[3] and Allottees

identifying deficient or inaccurate analyses, the lack of analysis and inaccurate claim that the ten-

mile withdrawal would cause little to no harm to the Nation and its citizens, the need for BLM to

consider the five-mile withdrawal as an alternative, and the failure to discuss the unresolved

alternative use conflict. Draft EA, Appx. A.

91.    The Final EA added the five-mile buffer as the "Reduced Withdrawal Alternative

(Alternative C)." Final EA § 2.3. However, it did not analyze, account for, or attempt to mitigate

the economic impacts that would be caused by a ten-mile buffer zone but avoided by a five-mile

buffer zone.

92.    Instead, the sole differences between the five and ten-mile alternatives identified

in the Final EA relate to the size of the area: more sites are within the ten-mile buffer—although

it is unclear whether those sites are on allotted land, private land, or federal land—and more fluid

mineral resources are removed from potential development.  *See* Final EA Table 1-4 (comparing

approximately 4,730 sites in proposed ten-mile withdrawal with approximately 1,900 sites in the

five-mile withdrawal).

93.    Appendix C.1 of the Final EA on the Economic Modelling Technical Approach is

the same calculation as the Draft EA estimates "206,737 [barrels] of oil and 3,759,416 mcf of

natural gas would be forgone per year as a result of the [ten]-mile withdrawal," and added "[t]he

estimated potential forgone development associated with the [five]-mile withdrawal is 68,318

---

[3] The Navajo Nation submitted comments on May 6, 2022 to BLM. The Nation's Comments are noted in Appendix
A of the Draft EA, however, they were not included in the May 2023 Public Comment Response Report.

[barrels] of oil and 1,242,324 mcf of natural gas per year." Final EA at Appendix C.1.

94.    Appendix C.2 provides that under a "[five]-mile withdrawal, it is estimated that the potential development of a total of 16 new oil and gas wells (6 horizontal and 10 vertical or directional) would be forgone." Final EA at Appendix C.2.

95.    However, these estimations in the Final EA do not reflect or address comments made regarding the accuracy of these predictions.

96.    Rather, commenters stated that the ten-mile Withdrawal prevents the development of 233 horizontal wells or over 86,000,000 barrels of oil and 25,850,000 mcf of natural gas. Based on the current productivity of wells times the number of wells that could be drilled had the federal minerals not been withdrawn and a royalty rate of 16.66% of combined royalties forgone, the total foregone economic benefit could be as much as $51,122,997 per year for a total of $1,022,459,948 for the 20-year Withdrawal. Enduring Resources IV, LLC, Comments on Bureau of Land Management "Proposed Chaco Area Withdrawal, Environmental Assessment, DOI-BLM-NM-FO10-2022-0011" (Dec. 9, 2022).

97.    Some commenters estimated that Navajo Allottees' tracts alone could lose nearly $200 million of revenue in forgone royalties. This presents an environmental justice issue as the Withdrawal disproportionately affects the surrounding community, where a disproportionate number of people are living under the poverty line.

98.    As raised in the comments to the Draft EA and not addressed in the Final EA, the predicted impacts of declines in revenue and jobs were not adequately captured nor disclosed. The Withdrawal negatively affects the mineral interests of over 20,000 Nation Allottees, in contrast with approximately 2,111 Nation Allottees who would be negatively impacted by the

alternative five-mile buffer. The Navajo Nation, Comments Regarding: Chaco Culture National Historic Park Area Withdrawal (May 6, 2022).

99.    The purpose of both the APA and NEPA is to try to make agencies analyze their proposed decisions, not simply to produce lengthy research papers to justify decisions post hoc. APA, 5 U.S.C. § 561; NEPA, 40 C.F.R. § 1500.1(a) (2022).

100.    This is especially true when the rights and interests of tribes and allottees are concerned and when the federal government takes action on Indian lands directly harming and against the express wishes of the Tribe.

101.    The Notice of Withdrawal was prepared without meaningful consultation with the local communities and individuals most affected, including the Nation and Allottees, and ignored the compromise proposed by the Nation.

102.    The Department of the Interior's consultation policy requires it to "invite Tribes to consult on a government to-government basis whenever there is a Departmental Action with Tribal implications." U.S. DEPARTMENT OF THE INTERIOR, DEPARTMENTAL MANUAL, 512 DM 4, § 4.4 (Nov. 30, 2022).

103.    The Department Manual provides that "[a]ll Bureaus and Offices shall make good-faith efforts to invite Tribes to consult early in the planning process and throughout the decision-making process and engage in robust, interactive, pre-decisional, informative, and transparent consultation when planning actions with tribal implications. It is the policy of the Department to seek consensus with impacted Tribes in accordance with the Consensus-Seeking Model." *Id*. § 4.4.

104.    The Department of the Interior is required to comply with its own internal policies

even if those policies are more rigorous than the policies mandated by the statute. And failure to do so constitutes arbitrary and capricious agency action or action without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

105.    Pursuant to her trust responsibility, the Secretary must respect the sovereignty and self-determination of the Navajo Nation. The Secretary also is required to protect the property of the Allottees. U.S. DEP'T OF THE INTERIOR, SECRETARIAL ORD. NO. 3335, "REAFFIRMATION OF THE FEDERAL TRUST RESPONSIBILITY TO FEDERALLY RECOGNIZED INDIAN TRIBES AND INDIVIDUAL INDIAN BENEFICIARIES" (2014).

106.    "The BLM recognizes that it has a broad trust responsibility that in some cases includes a fiduciary duty related to Indian trust assets and property or interests reserved by or granted to Indian tribes or Indian individuals by treaty, statute, and Executive orders." BUREAU OF LAND MANAGEMENT, TRIBAL RELATIONS, MS-1780, § A(10) (2016).

107.    The Nation's preferred limited five-mile alternative withdrawal would provide a more targeted approach that would avoid imposing large costs on the Nation's families. Defendants refused to give any serious consideration to the Nation's proposed alternative.

108.    Lastly, the Draft EA and Final EA state that the planning effort under the RMPA/EIS process is separate from the Withdrawal evaluated in the Draft and Final EAs.  *See* Draft EA §§ 1.1, 2.4; Final EA §§ 1.1, 2.5. However, the Withdrawal renders this required RMPA/EIS procedure moot, and the BLM accordingly announced on December 15, 2023 its plan to halt the RMPA/EIS process, effective in 2024. Bureau of Land Management, Farmington Mancos-Gallup RMP Amendment, DOI-BLM-NM-F010-2017-0128-RMP-EIS (Dec. 22, 2023).

**FIRST CLAIM FOR RELIEF**
**(Failure to Conduct Adequate Environmental Justice Analysis as Required by NEPA)**

109.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 108 of this Complaint, as though fully set forth below.

110.     The Department of the Interior violated NEPA. 42 U.S.C. § 4321 *et seq*.

111.     The Department of the Interior failed to consider relevant EJ factors in the NEPA analysis underlying the Withdrawal regarding the disproportionate impact the Withdrawal would have on the low-income, EJ population comprising Navajo Nation.

112.     Under NEPA, agencies must address environmental effects, including economic impacts, when they adversely impact disproportionately impacted communities.

113.     In so doing, the Department of the Interior must use some form of acceptable methodology to reach its conclusions.

114.     The Department of the Interior's analysis failed to analyze adequately the impacts of the Withdrawal on the Navajo Nation. The Department of the Interior's EJ analysis only considered county-level socioeconomic data rather than data specific to the Navajo citizens and allotees who would be disproportionately impacted by the Withdrawal.

115.     Several commenters identified that the foregone revenue for the Navajo allottees' tracts would amount to nearly $200 million for the 20-year withdrawal period, which significantly departs from the estimate provided by the Department in the EA.

116.     Although the EA correctly identifies that all tribal census tracts analyzed fit the definition of low-income EJ communities, the EA failed to analyze the economic impacts to the specific Navajo Nation population as opposed to the general population of the county.

117.     The Department failed to recognize the disproportionate impacts on the Nation

and Allottees, and failed to produce or analyze data that would provide a rational basis for its conclusion that such impacts are "indirect" or the same as to non-Indian communities. Its failure to provide or analyze such data is arbitrary and capricious.

118.    Further, the Department failed to address adequately comments pointing out inaccuracies and discrepancies in valuing the Nation's and Allottees' mineral resources affected by the Withdrawal, and showing a significant impact to the human environment. Defendants' failure to address these discrepancies and provide rebuttal evidence and adequate support for its conclusions is arbitrary and capricious.

119.    Where the Department rests its decision, even in part, on an infirm ground, the decision is arbitrary and capricious. *See Vecinos para el Bienestar de la Comunidad Costera*, 6 F.4th at 1331. And for "agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the APA instructs courts to "hold unlawful and set aside" the violative decision. 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF
### (Failure to Prepare an Environmental Impact Statement)

120.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 119 of this Complaint, as though fully set forth below.

121.    The Department violated NEPA and the APA by failing to conclude that the Withdrawal has a significant impact on the environment, necessitating more thorough analysis via an Environmental Impact Statement.

122.    NEPA requires preparation of an EA for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EA "must discuss the need for the [action], alternatives to the [action], and the environmental impacts of the

[action]and any alternatives," and include "not only direct but also indirect and cumulative impacts." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1166 (10th Cir. 2012). If there will be a "significant impact," which is "determined by the action's context and its intensity," the agency must complete an EIS. *Id.*

123.    An EIS is the statutorily mandated vehicle to weigh the issues presented by commenters and balance the economic impacts of the Withdrawal with the alleged environmental benefits.

124.    Review of an agency's decision to issue a FONSI and not prepare an EIS requires a determination of "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004). Courts use the "arbitrary and capricious" standard to determine whether the agency has taken the requisite "hard look" at the environmental consequences of the proposed actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons explaining why the project's impacts are insignificant.

125.    The Final EA published in May of 2023 included an analysis of the five-mile buffer alternative that had not been addressed in the Draft EA on which public comment was solicited. *See* Final EA § 2.3. Thus, the Department of the Interior did not adequately consider whether the five-mile buffer adequately addressed some of the economic impacts that the allottees raised. Such analysis would be included in an EIS.

126.    The Department acted arbitrarily and capriciously by failing to take a hard look at the impacts on the environment, including the economic impacts of the Withdrawal on the

Navajo and vulnerable EJ communities within the proposed Withdrawal area and how those impacts could be minimizes through mitigation measures.

### THIRD CLAIM FOR RELIEF
### (Failure to Meaningfully Consult the Navajo Nation)

127.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 126 of this Complaint, as through fully set forth below.

128.    The Department of the Interior acted arbitrarily and capriciously by failing to abide by its own consultation policy when preparing the Draft and Final EA underlying the Public Land Order effectuating the Withdrawal.

129.    The Department of the Interior failed to meaningfully consult with Navajo Nation as mandated by the Department's own consultation policy excerpted above. Despite meeting with the Navajo Nation and Allottees several times prior to issuance of a Draft EA in which the Nation proposed a five-mile buffer alternative, the Department did not include the five-mile alternative in the Draft EA on which the public could comment. Such failure is in violation of the Department's own policy that consultation be "interactive, pre-decisional, and transparent." U.S. DEPARTMENT OF THE INTERIOR, DEPARTMENTAL MANUAL, 512 DM 4, § 4.4 (NOV. 30, 2022).

130.    Further, in violation of its own policies, the Department made no effort to seek consensus with the Nation and Allottees, the only entities with property interests within the Withdrawal area. The Department did nothing to compromise its original goal for the Public Land Order effectuating the Withdrawal despite concerns raised by the Navajo Nation as well as an alternative five-mile buffer zone, which would have alleviated significant financial impacts to tribal allottees.

131.    The Department failed to respect the Nation's sovereignty and interests in lands

within its own reservation boundaries, instead substituting its own judgment for that of the Nation's in determining what is best for the Navajo Nation and its people.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following affirmative relief:

A.    A declaration that Public Land Order No. 7923 for Public Lands Withdrawal Surrounding Chaco Culture National Historical Park Boundary; San Juan, Sandoval, and McKinley Counties, New Mexico, 88 Fed. Reg. 37266 (Jun. 7, 2023), is invalid and unenforceable.

B.    A permanent injunction setting aside and holding unlawful the Public Land Order No. 7923 for Public Lands Withdrawal Surrounding Chaco Culture National Historical Park Boundary; San Juan, Sandoval, and McKinley Counties, New Mexico, 88 Fed. Reg. 37266 (Jun. 7, 2023).

C.    Alternatively, a preliminary injunction setting aside Public Land Order No. 7923 until an Environmental Impact Statement is completed and meaningful consultation with the Navajo Nation and Allottees is conducted.

D.    Attorneys' fees and costs incurred in relation to this case.

E.    Such other and further relief the Court deems just and proper.

Dated:  January 17, 2025.

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By */s/ Debashree Nandy*
    Debashree Nandy
    201 Third Street NW, Suite 1800
    Albuquerque, New Mexico 87102-4386
    Phone: (505) 244-0770
    Email: rnandy@bhfs.com

Sarah A. Murray (*pro hac vice to be submitted*)
Bella Sewall Wolitz (*pro hac vice to be submitted*)
1155 F Street, NW, Suite 1200
Washington, D.C. 20004
Phone: (202) 296-7353
Email: smurray@bhfs.com; BSewallWolitz@bhfs.com

*Attorneys for Plaintiff The Navajo Nation*

32415068

**COMPLAINT**
**Page 33 of 33**